# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 19-1917V
Filed: August 31, 2022
UNPUBLISHED

| | |
|---|---|
| DEBRA CAIN,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Special Master Horner<br><br>Finding of Fact; Shoulder Injury Related to Vaccine Administration ("SIRVA"); Onset |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for petitioner.
*Sarah Christina Duncan*, U.S. Department of Justice, Washington, DC, for respondent.

### **FINDING OF FACT**[1]

On December 18, 2019, petitioner filed a petition under the National Childhood Vaccine Injury Act, 42 U.S.C. § 300aa-10-34 (2012),[2] alleging that as a result of an influenza ("flu") vaccination received on January 15, 2019, she suffered a right shoulder injury related to vaccine administration ("SIRVA"). (ECF No. 1.) Petitioner now moves for a finding of fact regarding the onset of her shoulder pain. (ECF No. 39.) For the reasons discussed below, I find that petitioner experienced onset of shoulder pain within 48 hours of receiving her vaccination.

### I.   Procedural History

Petitioner filed her petition on December 18, 2019, followed by supporting medical records and a Statement of Completion on December 30, 2019. (ECF Nos. 1,

---

[1] Because this decision contains a reasoned explanation for the special master's action in this case, it will be posted on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  *See* 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services).  **This means the decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information the disclosure of which would constitute an unwarranted invasion of privacy. If the special master, upon review, agrees that the identified material fits within this definition, it will be redacted from public access.

[2] Within this decision, all citations to § 300aa will be the relevant sections of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

1

6, 7.)  This case was originally assigned to the Court's Special Processing Unit ("SPU").  (ECF No. 9.)

After petitioner filed additional medical records to support her petition (ECF Nos. 13, 17, 21), respondent filed his Rule 4(c) report recommending against compensation on April 19, 2021 (ECF No. 25).  Respondent stated that petitioner's presentation is inconsistent with a SIRVA, specifically, that the records do not support an onset of a shoulder injury within 48 hours of vaccine administration.  (ECF No. 25, p. 7.)  Accordingly, Chief Special Master Corcoran determined that the case was no longer appropriate for SPU.  (ECF No. 26.)  Thereafter, this case was reassigned to my docket.  (ECF No. 27.)

A fact hearing was held on August 18, 2021.  (ECF No. 35, Transcript of Proceedings ("Tr.").)  Following the hearing, the parties agreed to brief the issue of onset.  (ECF No. 36.)  Petitioner filed her motion for a finding of fact on November 18, 2021.  (ECF No. 39.)  Respondent filed his response to petitioner's motion on January 3, 2022.  (ECF No. 40.)  Petitioner filed her reply on January 17, 2022.  (ECF No. 41.)

This matter is now ripe for a finding of fact regarding the issue of onset.

## II.     Factual History

### a.  As Reflected in Medical Records

Prior to vaccination, petitioner was involved in a motor vehicle accident in March 2003.  (Ex. 14, p. 6.)  Due to complications from the accident, petitioner underwent a left shoulder subacromial decompression on February 16, 2012.  (Ex. 11; *see also* Ex. 3, p. 57.)  In addition to her left shoulder injury, petitioner has a history of left leg numbness, chronic back pain, sciatica, gastroesophageal reflux disease, left knee pain, hypertension, hyperlipidemia, asthma, major depression, and anxiety.  (Ex. 3, p. 17; Ex. 8, p. 4, 9, 17; Ex. 17.)  Petitioner had no history of right shoulder pain before receiving the flu vaccine.

On January 15, 2019, petitioner received the flu vaccine in her right shoulder at a Safeway Pharmacy.  (Ex. 1, p. 4.)

About three months later, on April 25, 2019, petitioner first sought medical care for her right shoulder pain at the UCHealth Memorial Hospital emergency room ("ER").  (Ex. 13, p. 9.)  Petitioner described her right shoulder pain as "chronic."  (*Id.*)  The history provided indicated that petitioner's pain was "worsening," not beginning, one month ago.  (*Id.* at 10.)  This record does not indicate when petitioner's initial onset occurred.  The ER doctor did not note any swelling and observed that there was no tenderness to palpitation in petitioner's right shoulder.  (*Id.* at 12.)  Petitioner's differential diagnoses included possible "shoulder sprain, rotator cuff tear, adhesive capsulitis, [and] impingement."  (*Id.* at 9.)  The ER doctor ruled out only "obvious acute bony shoulder injury" and noted "it is difficult to rule out all possibilities during an ER

visit." (*Id.*)  Petitioner received a referral to an orthopedist and was directed to follow up with her primary care physician.  (*Id.* at 10.)

Later that same day, petitioner went to the Penrose Hospital ER with complaints of hypertension and right-sided shoulder pain."[3]  (Ex. 3, p. 60.)  The ER doctor recorded that petitioner had "[p]ain with right shoulder range of motion, no pain with minimal range of motion."  (*Id.* at 59.)  The history of present illness indicates that petitioner had shoulder pain "for the last month."  (*Id.* at 57.)  The final diagnosis at this visit was "[r]ight shoulder pain, unspecified chronicity."  (*Id.* at 60.)  Petitioner underwent an x-ray of her right shoulder, which showed mild hypertrophy in the acromioclavicular joint and mild degenerative joint disease.  (*Id.* at 66-67.)  Petitioner received a Toradol injection and was directed to follow up with her primary care provider.  (*Id.* at 60.)

Petitioner began seeing a new primary care physician, Dr. Dominique Walker, on May 31, 2019.  (Ex. 4, p. 52.)  Petitioner reported that she had "[c]hronic right shoulder pain" and that her bilateral shoulders were "in pain all the time."  (*Id.* at 56-57.)  Petitioner denied any injury to her right shoulder but noted that she "feels like she has worse pain every time she has a flu shot."  (*Id.* at 57.)  Upon examination, Dr. Walker observed "decreased range of motion, tenderness, crepitus, pain and decreased strength" in her right shoulder.  (*Id.* at 58.)  Dr. Walker referred petitioner to physical therapy.  (*Id.* at 63.)

On June 25, 2019, petitioner visited orthopedist Dr. John Pak for her right shoulder pain.  (Ex. 5, p. 41.)  Dr. Pak noted that petitioner's onset of right shoulder pain occurred in March 2019.  (*Id.*)  He recorded, "Patient states she received a flu shot back in March got a big lump and ever since has had shoulder pain."  (*Id.*)  Dr. Pak further noted that petitioner experienced "some pain shortly after her flu shot" and "noticed increasing pain as well as decreased range of motion."  (*Id.* at 43.)  Dr. Pak diagnosed petitioner with right shoulder bursitis, chronic right shoulder pain, adhesive capsulitis, and right shoulder impingement.  (*Id.*)  Dr. Pak administered a cortisone injection in petitioner's right shoulder and recommended physical therapy.  (*Id.*)

Petitioner attended her first physical therapy session at Action Potential Physical Therapy on July 8, 2019.  (Ex. 6, p. 11.)  The physical therapy records note that petitioner had been experiencing right shoulder pain since March 2019.  The records further state that petitioner's "shoulder started bothering her after a [f]lu shot."  (*Id.*)  Petitioner's handwritten intake form for this evaluation confirms that petitioner reported: "I had a flu shot[,] soreness became painful and got bad."  (*Id.* at 15.)  Petitioner wrote "March" when prompted to answer whether she had any "recent flare-up."  (*Id.*)  Petitioner returned for another physical therapy session on July 11, 2019, during which she had difficulty performing exercises due to her pain.  (*Id.* at 3.)

On July 23, 2019, petitioner returned to Dr. Pak.  (Ex. 5, p. 26.)  Petitioner reported that her right shoulder pain had not improved since beginning physical therapy,

---

[3] This record inconsistently records the affected shoulder.  (*Compare* Ex. 3, p. 57 (incorrectly recording the left shoulder), *with id.* at 60 (correctly recording the right shoulder).)

and that her pain had increased. (*Id.*) Petitioner reported that her prior cortisone injection provided only minimal relief and that she continued to struggle with activities of daily living. (*Id.*) Dr. Pak discussed surgical intervention, and petitioner scheduled "manipulation under anesthesia of the right shoulder followed by right shoulder arthroscopy with debridement and possible subacromial decompression/acromioplasty." (*Id.*)

Petitioner returned to Dr. Pak for a pre-operative evaluation on August 9, 2019. (Ex. 5, p. 9.) Petitioner confirmed her desire to proceed with the surgery, and it was scheduled for the following week. (*Id.*) On August 14, 2019, petitioner underwent a right shoulder arthroscopy with capsular release and subacromial decompression and acromioplasty. (Ex. 7, p. 35.)

Petitioner has not submitted any records documenting her treatment beyond August 14, 2019.

### b. As Reflected in Affidavits

#### i. Petitioner's Affidavit

Petitioner filed an affidavit on December 30, 2019. (Ex. 2.) Petitioner avers in her affidavit that within hours of receiving the flu shot on January 15, 2019, her right shoulder began to "swell up like an egg at the injection site." (*Id.* at 2.) She states that the swelling began to resolve after a few days. (*Id.*) However, once the swelling resolved, petitioner states that her shoulder pain increased, and her range of motion decreased in the days following her flu shot. (*Id.*) Petitioner averred that during this time, she had Medicaid, and "It was unlikely that [she] could see a specialist for [her] shoulder." (*Id.* at 3.) When her shoulder pain "became unbearable," she decided to go to the ER. (*Id.*)

#### ii. Affidavit of Debora Hodge

Petitioner also submitted an affidavit from her friend and former roommate, Debora Hodge, who she lived with at the time she received her flu shot. (Ex. 15.) Ms. Hodge recalled that petitioner's symptoms began within 48 hours of receiving her flu vaccine on January 15, 2019. Ms. Hodge stated in her affidavit that she spent every day with petitioner. She recalled that petitioner received a flu shot on January 15, 2019, and that "about 30 minutes after receiving the flu shot, [petitioner] came home and immediately complained to me of her shoulder pain at the site of injection." (*Id.* at 2.) When she asked petitioner what was wrong, petitioner told her that "her right shoulder hurt a lot after receiving the shot." (*Id.*) Ms. Hodge averred that she inspected the injection site the day petitioner received her flu shot and stated that it "was already swollen to the size of a golf ball." (*Id.*) Ms. Hodge further noted that based on her experience as a medical assistant, she "immediately noticed that the site of the injection was too high up on [petitioner's] shoulder." (*Id.*)

Ms. Hodge further stated that she accompanied petitioner when she went to the ER in March 2019 and that "[w]hen the doctor noticed the swelling and the location of the injury, the doctor specifically asked if [petitioner] had received a flu shot at the location of the injury."  (Ex. 15, p. 2.)

Ms. Hodge passed away before the fact hearing held on August 18, 2021.  (ECF No. 31; Tr. 4; ECF No. 39, p. 6.)

### c. As Reflected in Testimony

At the fact hearing on August 18, 2021, petitioner testified about the injury to her left shoulder after a car accident in 2003.  (Tr. 8.)  Petitioner had surgery on her shoulder in March 2011 because she did not address the injury until it worsened.  (*Id.*)  After the surgery, petitioner completed physical therapy, and her left shoulder injury completely resolved within six months of the surgery, around September or October 2011.  (*Id.*)  Petitioner testified that from September or October 2011 through January 2019, she had no shoulder pain in either of her shoulders.  (*Id.* at 9.)

Petitioner received the flu vaccine on January 15, 2019, at the Safeway Pharmacy, while she was grocery shopping.  (Tr. 11.)  Petitioner testified that she requested the vaccine in her right shoulder because she was "afraid that they would do damage to the previous surgery on the left side."  (*Id.*)  Petitioner testified that she received the flu shot "high up" in her right shoulder, and that she was in immediate pain by the time she got to the parking lot.  (*Id.* at 11, 17.)  Petitioner stated that by the time she got to her car, her right shoulder began to swell.  (*Id.*)  She recalled that the swelling "looked like a small egg underneath the skin."  (*Id.* at 12.)

After the vaccination, petitioner went straight home and spoke with her roommate, Ms. Hodge.  (Tr. 13.)  She recalled telling Ms. Hodge that she had received the flu shot, that her arm was swollen and painful, and that she was in more pain than she had experienced with previous shots.  (*Id.*)  Ms. Hodge looked at petitioner's shoulder and they agreed to "wait for a while" and "[take] care of it at home" because petitioner did not "have any access to medical care at the time."  (*Id.*)  To manage her pain, petitioner testified that she used hot and cold packs, a TENS machine, and Tylenol.  (*Id.* at 14.)  Petitioner stated that even though she had never experienced swelling at an injection site before, she did not consider asking the pharmacist about the lump that developed.  (*Id.* at 40.)

While petitioner remembered having immediate pain after vaccination, she testified that she began to lose range of motion and notice weakness in her right shoulder about three or four days after the injection.  (Tr. 15.)  Over the next several weeks, petitioner's pain worsened.  (*Id.* at 14.)  She testified that she began having trouble dressing herself and doing her hair in January 2019.  (*Id.* at 42-42.)  Additionally, she had difficulty performing activities of daily living such as vacuuming, reaching to get things from the refrigerator, and using the steering wheel in her car.  (*Id.* at 14, 16.)  She

described the pain as "bone-on-bone" and stated that she could "hardly use [her] right arm at all." (*Id.* at 14.)

Petitioner testified that she visited the Penrose Hospital ER on April 25, 2019, because her right shoulder pain was "intense." (Tr. 16.) Petitioner stated that she considered seeing a doctor right away for her shoulder pain but delayed treatment because she had no insurance coverage. (*Id.* at 15, 17, 44.) Petitioner had recently moved from Arizona to Colorado, and she believed that her "insurance had not transferred with [her] yet." (*Id.* at 15, 17.) She further explained that because her insurance coverage would not become effective until May 1, 2019, she tried to delay treatment to avoid incurring medical bills she could not pay.[4] (*Id.*) Before visiting Penrose Hospital, she recalled that she could not sleep, and she was in "severe excruciating pain every day, every time [she] moved [her] arm." (*Id.* at 16.) She claimed that Tylenol was no longer helping, and she "couldn't take the pain anymore[.]" (*Id.*) She was also unable to perform activities of daily living, such as vacuuming and doing the dishes. (*Id.*) Petitioner confirmed that from her vaccination on January 15, 2019, to her presentation to the ER on April 25, 2019, she did not suffer any accidents, falls, or other trauma that could explain her shoulder pain. (*Id.* at 17.)

At Penrose Hospital petitioner recalled informing the doctor that the pain began immediately after receiving the flu shot. (*Id.*) She testified, "The doctor examined my shoulder, asked me if I had any injuries, and I told him no, nothing but the flu shot." (*Id.*) Petitioner testified that the doctor then evaluated her range of motion, ordered an x-ray, administered a Toradol shot, and referred her to an orthopedist. (*Id.* at 17-18.) Petitioner stated that the doctor believed petitioner had "a frozen shoulder" because she did not have full range of motion. (*Id.*)

Petitioner acknowledged that she told medical staff that her shoulder injury began after receiving a flu vaccine in March 2019 even though she received the flu vaccine in January 2019. (*Id.* at 18-19.) Petitioner explained that she mistakenly told medical staff that she received the flu vaccine in March 2019 because she had been off her psychiatric medication for a year and had trouble identifying the date of her injury due to her psychiatric issues. (*Id.*) She elaborated:

> I had run out of my medication for my psychiatric issues. And when that happens, there's something down in my brain and I become confused, I have rapid speech, I don't know what time of day it is or what day it is sometimes. I just kind of live from hour to hour like that. I have extreme paranoia from it . . . . [U]ntil I was able to see my doctor, I was unmedicated and just kind of spinning there waiting. And no time—you know, you don't have any concept of time. You get days mixed up, months mixed up, even

---

[4] After the fact hearing, petitioner filed a letter from the State of Colorado dated March 21, 2019. (Ex. 18.) The letter indicated that petitioner applied for medical assistance benefits on March 20, 2019, and her application was approved the same day. (*Id.* at 3.) The letter noted that petitioner's Health First Colorado (Colorado Medicaid) benefits would cover past medical costs from February 1 to 28, 2019, and that her Colorado Medicaid coverage would begin on April 1, 2019. (*Id.* at 4.)

years sometimes.  But I did the best I could without being medicated, you know . . . .

(*Id.* at 18-19.)

Petitioner testified that her next medical visit was with her primary care physician, Dr. Walker.  (Tr. 20.)  Petitioner confirmed that she was not taking any psychiatric medication at the time of this visit.  (*Id.*)  Petitioner established care with Dr. Walker so that she could obtain a referral to an orthopedist.  (*Id.*)  She recalled her right shoulder being in significant pain at the time of the visit.  (*Id.* at 22.)  At the visit, petitioner again associated the onset of her right shoulder pain with her flu shot.  (*Id.* at 21.)  Dr. Walker prescribed petitioner Zoloft for her psychiatric issues and referred her to an orthopedist. (*Id.*)

The next month, petitioner recalled seeing orthopedist Dr. Pak at Centura Orthopedics.  (Tr. 22.)  Petitioner testified that she told Dr. Pak that the pain in her right shoulder began after she received a flu vaccine.  (*Id.* at 22-23.)  She testified that she did not speak with Dr. Pak about any other potential causes for her right shoulder pain. (*Id.*)  Petitioner stated that she did not tell Dr. Pak the date of her flu shot, but she believed the records indicate a March 2019 onset because Dr. Pak and Dr. Walker shared the same computer system.  (*Id.* at 24.)  At the visit with Dr. Pak, petitioner received a cortisone injection in her right shoulder, which did not alleviate the pain.  (*Id.* at 22-23.)

Petitioner testified that she saw Dr. Pak about five more times before her shoulder surgery.  (Tr. 25.)  Petitioner also recalled attending two or three physical therapy sessions before her surgery, which did not help her pain.  (*Id.* at 22-24.) Petitioner testified that she did not inform her physical therapist of the date of her flu shot, but she believed the physical therapy records reflect March 2019 as the onset because the facility, Action Potential, is part of the same health system as Dr. Walker and Centura Orthopedics.  (*Id.*)

After cortisone injections and physical therapy failed to alleviate her right shoulder pain, petitioner elected to have surgery in August 2019.  (*Id.* at 27.)  Petitioner recalled attending six to eight physical therapy sessions and receiving one cortisone shot after her surgery to help rehabilitate her shoulder.  (*Id.* at 28-29.)  However, she testified that she decided to stop physical therapy and continue therapy exercises at home with the help of Ms. Hodge due to her agoraphobia.  (*Id.*)

When asked about the current state of her right shoulder, petitioner stated she still experiences weakness and cannot hold her arm up for very long.  (*Id.* at 30.) Although she has range of motion, petitioner testified that she "do[es] not have range of motion without pain."  (*Id.*)  Additionally, petitioner stated that she continues to struggle with activities of daily life, including braiding her hair, picking up her great granddaughter, and picking up groceries and laundry baskets.  (*Id.*)  Petitioner also

stated that she was seeking treatment for her mental health at the time of the fact hearing.  (*Id.* at 32.)

### III.   Standard of Adjudication

The Vaccine Act instructs that the special master may find the time period for the first symptom or manifestation of onset required for a Table Injury is satisfied "even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such a period."  § 300aa-13(b)(2).  However, consistent with petitioner's burden of proof overall, that finding must be supported by preponderant evidence.  *Id*.

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records.  § 300aa-11(c)(2).  The special master is required to consider "all [ ] relevant medical and scientific evidence contained in the record," including "any diagnosis, conclusion, medical judgment, or autopsy or coroner's report which is contained in the record regarding the nature, causation, and aggravation of the petitioner's illness, disability, injury, condition, or death," as well as "the results of any diagnostic or evaluative test which are contained in the record and the summaries and conclusions."  § 300aa-13(b)(1)(A).  The special master is then required to weigh the evidence presented, including contemporaneous medical records and testimony.  *See Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (it is within the special master's discretion to determine whether to afford greater weight to contemporaneous medical records than to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such a determination is evidenced by a rational determination).  Petitioner must prove by a preponderance of the evidence the factual circumstances surrounding her claim.  § 300aa-13(a)(1)(A).

Medical records that are created contemporaneously with the events they describe are generally considered "trustworthy."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).  Accordingly, if the medical records are clear, consistent, and complete, then they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  Indeed, contemporaneous medical records are generally found to be deserving of greater evidentiary weight than oral testimony— especially where such testimony conflicts with the record evidence.  *Cucuras*, 993 F.2d at 1528; *see also Murphy v. Sec'y of Health & Human Servs.*, 23 Cl. Ct. 726, 733 (1991) (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948) ("It has generally been held that oral testimony which is in conflict with contemporaneous documents is entitled to little evidentiary weight."), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992), *cert. den'd*, *Murphy v. Sullivan*, 506 U.S. 974 (1992)

However, there are situations in which compelling oral testimony may be more persuasive than written records, such as where records are deemed to be incomplete or

inaccurate.  *Campbell v. Sec'y of Health & Human Servs.*, 69 Fed. Cl. 775, 779 (2006) ("like any norm based upon common sense and experience, this rule should not be treated as an absolute and must yield where the factual predicates for its application are weak or lacking"); *Lowrie*, 2005 WL 6117475, at *19 ("Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent.") (quoting *Murphy*, 23 Cl. Ct. at 733).

When witness testimony is offered to overcome the presumption of accuracy afforded to contemporaneous medical records, such testimony must be "consistent, clear, cogent, and compelling."  *Sanchez v. Sec'y of Health & Human Servs.*, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).  In determining the accuracy and completeness of medical records, the Court of Federal Claims has listed four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  *La Londe v. Sec'y Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1334 (Fed. Cir. 2014).  In determining whether to afford greater weight to contemporaneous medical records or other evidence, such as testimony at hearing, there must be evidence that this decision was the result of a rational determination.  *Burns*, 3 F.3d at 417.

## IV.  Party Contentions

### a.  Petitioner's Contentions

Petitioner contends that the record as a whole supports a finding that petitioner's right shoulder pain began within 48 hours of her January 15, 2019 flu vaccination.  (ECF No. 39, p. 15.)  Petitioner notes that she averred in her affidavit that she experienced immediate pain in her right shoulder following vaccination.  (*Id.* (citing Ex. 2).)  Petitioner argues that petitioner's affidavit testimony is supported by Ms. Hodge's affidavit, in which Ms. Hodge recalled petitioner's shoulder pain beginning shortly after receiving the flu vaccine.  (*Id.* (citing Ex. 15, p. 2).)  Further, petitioner contends that her and Ms. Hodge's affidavit testimony is supported by petitioner's fact hearing testimony.  (*Id.* at 15-16.)  At the fact hearing, petitioner testified that after receiving the flu shot, she was in pain by the time she reached the parking lot, and that her right shoulder was swollen by the time she arrived home.  (Tr. 11-13, 17.)  She further testified that she informed her providers that her right shoulder pain began after receiving the flu shot.  (*Id.* at 17, 21-23.)  Additionally, petitioner argues that her testimony that she had not had any accidents, falls, or other trauma between January 15, 2019, and April 25, 2019, supports a finding that her right shoulder pain began within 48 hours of vaccination.  (ECF No. 39, p. 17 (citing Tr. 32).)

Petitioner further contends that the medical records support her contention that her shoulder pain began within 48 hours of receiving the flu vaccination. (ECF No. 39, 17-19.) Petitioner relies on the medical records from her visits to Dr. Walker, Dr. Pak, and her physical therapist, during which she consistently associated her right shoulder pain with her flu shot. (*Id.* (citing Ex 4, pp. 56-57; Ex. 5, pp. 41-43; Ex. 6, p. 6).) She argues that her testimony regarding her mental health issues explains why some of the medical records document an onset of March 2019. (*Id.* at 18-19 (citing Tr. 19).) Petitioner notes that due to her untreated psychiatric illness, her "concept of time, dates, and space were adversely affected." (*Id.* at 19.) Despite petitioner providing an incorrect onset date of March 2019, petitioner emphasizes that she consistently related her right shoulder pain to receipt of her flu shot. (*Id.*)

Regarding petitioner's delay in seeking treatment until approximately three months after vaccination, petitioner contends that her fact hearing testimony provides a credible explanation. (ECF No. 39, p. 19.) Petitioner notes that she had a gap in insurance coverage when she moved from Arizona to Colorado. (*Id.* (citing Tr. 15).) She stresses that once her Medicare benefits had been established in Colorado, she "promptly set up an appointment with her primary care physician" to address her shoulder pain. (*Id.*) She claims that her testimony is supported by the letter from the State of Colorado describing that petitioner did not have Medicaid coverage until April 2019. (*Id.* (citing Ex. 18, p. 7).) Thus, petitioner contends that the totality of evidence supports a finding that her right shoulder pain began within 48 hours of vaccination.

### b. Respondent's Contentions

To dispute petitioner's contention that her shoulder pain began within 48 hours of vaccination, respondent challenges the credibility of both petitioner's testimony and Ms. Hodge's affidavit. (ECF No. 40, p. 11-12.) Specifically, respondent argues that petitioner's testimony as to which providers she described the onset of her pain was "inconsistent and unreliable." (*Id.* at 11.) Respondent claims that petitioner testified that that some of her providers must have acquired information regarding the date of onset from shared electronic records, but she contradicted herself on cross-examination when she acknowledged that she incorrectly provided an onset of March 2019. (*Id.* at 11-12.) Respondent also notes that it is unclear whether petitioner's medical providers are part of the same health care system and would have shared electronic records. (*Id.* at 11, n.6.) Additionally, respondent points out that petitioner first testified that her physical therapist must have recorded the incorrect onset date due to a language barrier, but later admitted that she likely reported a March 2019 onset date. (*Id.* at 12 (citing Tr. 51-52).) Respondent also notes that petitioner "was unable to accurately recall the date of her prior left shoulder surgery and acknowledged, 'I frequently mess up dates and that's my fault.'" (*Id.* (citing Tr. 37).) Regarding Ms. Hodge's affidavit, respondent emphasizes that it "contained several inaccuracies, raising questions as to the reliability of her recollection." (*Id.*) For instance, respondent notes that Ms. Hodge's affidavit incorrectly described petitioner's ER visit as occurring in March 2019 and that Ms. Hodge claimed petitioner's right shoulder had swelling at the time of her ER visit, though the ER visits do not document swelling. (*Id.*)

Respondent also argues that the medical records do not support petitioner's claim that she experienced an onset of pain in her right shoulder within 48 hours of vaccination because "petitioner's medical records consistently document the onset of right shoulder pain in March 2019." (ECF No. 40, p. 12.)  Respondent relies on petitioner's first ER visit on April 25, 2019, during which petitioner reported worsening shoulder pain over the past month, and petitioner's second ER visit on the same date, during which she reported right shoulder pain for the past month. (*Id.* at 11 (citing Ex. 13; Ex. 3, p. 57).)  Respondent also cites the medical records from petitioner's visit to Dr. Pak and to her physical therapist, which document a March 2019 onset date. (*Id.* (citing Ex. 5, pp. 41, 43; Ex. 6, p. 11).)  Respondent acknowledges petitioner's testimony that she "inaccurately reported the onset of her shoulder pain because she was unmedicated at the time and could not keep days, months, or sometimes even years straight" but stresses that petitioner consistently reported March 2019 as the onset of her pain despite this confusion. (*Id.*)

Further, respondent asserts that petitioner's delay in seeking treatment indicates that her shoulder pain did not begin within 48 hours of vaccination. (ECF No. 40, p. 10.)  Petitioner first sought treatment for her shoulder pain on April 25, 2019, over three months after vaccination. (Ex. 13, p. 9; Ex. 3, p. 60.)  Respondent notes that petitioner applied and received approval for state medical assistance benefits on March 20, 2019, and her benefits became effective on April 1, 2019—not May 1, 2019, as petitioner suggested. (ECF No. 40, p. 10-11.)  Respondent challenges petitioner's testimony that she sought treatment at the ER on April 25, 2019 because "she couldn't take it anymore" and emphasizes that "her benefits had already been in effect for nearly a month at that point." (*Id.* at 11 (quoting Tr. 16).)  Thus, based on the record as a whole, respondent contents that there is not preponderant evidence that petitioner's shoulder pain began within 48 hours of vaccination.

### V.     Discussion

Upon my review of the entire record, I find preponderant evidence that petitioner's alleged vaccine-caused shoulder pain began within 48 hours of her January 15, 2019 flu vaccination.  This finding is based in part on petitioner's testimony describing pain beginning immediately post-vaccination (Tr. 11-13, 17), but also on petitioner's contemporaneous treatment records which repeatedly and consistently attribute her shoulder pain to her vaccination. (*See* Ex. 4, pp. 56-57 (Dr. Walker); Ex. 5, pp. 31-43 (Dr. Pak); Ex. 6, p. 11 (physical therapy).)  Petitioner also explained that she did not suffer any other accidents, falls, or other traumas during the relevant period that would explain her right shoulder condition (Tr. 17), a point that would seem to be corroborated by the medical records.

At her visit with Dr. Walker, petitioner associated her shoulder pain with receipt of her flu shot. (*See* Ex. 4, pp. 56-57.)  The record from petitioner's visit to Dr. Pak on June 25, 2019, confirms that petitioner related the onset of her shoulder pain to "shortly after" receipt of the flu vaccination. (Ex. 5, pp. 43, 51.)  Finally, at petitioner's physical therapy evaluation on July 8, 2019, petitioner reported that her right shoulder began

bothering her after receipt of the flu shot.  (Ex. 6, p. 11.)  In her handwritten intake form from this evaluation, petitioner stated "I had a flu shot[,] soreness became painful and got bad."  (*Id.* at 15.)  Thus, the medical records are persuasive in linking the onset of petitioner's shoulder pain to her flu vaccination.  Even if these records do not explicitly state that onset occurred within 48 hours, they are sufficient to corroborate petitioner's testimony that onset was immediate.

Some of petitioner's medical records reflect onset occurring in March of 2019, which is about three months post-vaccination.  (Ex. 3, p. 57; Ex. 5, pp. 41, 43; Ex. 6, p. 11.)  However, that stated period of onset is not controlling when viewing the record as a whole.  First, while these records indicate that onset occurred in March of 2019, many of these same notations also place onset in the context of vaccination, which is documented to have occurred earlier.  Second, petitioner testifies that she was experiencing date confusion at the time she was seeking treatment.  (Tr. 18-19.)  This is corroborated by a contemporaneous medical record explicitly confirming that petitioner had misreported her vaccination as having occurred in March.[5]  (Ex. 5, p. 41.)  And, finally, petitioner's initial treatment record indicates that as of April 25, 2019, petitioner had experienced a "worsening" of her shoulder pain one month prior, *i.e.*, in March of 2019.  (Ex. 13, p. 10.)  That medical record characterizes the shoulder pain as "chronic" by that time.[6]  (*Id.* at 9.)  Petitioner similarly wrote "March" in her physical therapy intake form when prompted to answer whether she had any "recent flare-up" (Ex. 6, p. 15), which is consistent with her initial ER encounter at which she reported that her pain had "worsened" in March (Ex. 13, p. 10).  While these factors may not be compelling in isolation, together they suggest that the specific notations of a March 2019 onset should not weigh more heavily than the other evidence of record.

Although petitioner's lack of insurance coverage until April 1, 2019, does not provide a complete explanation for why she did not seek treatment until April 25, 2019, a delay in seeking treatment does not per se defeat a claim for a Table Injury of SIRVA.  *See*, *e.g.*, *Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2020 WL 7873272, at *11 (Fed. Cl. Spec. Mstr. Dec. 11, 2020) (noting that "there is no such thing as an 'appropriate' time to seek treatment"); *Smallwood v. Sec'y of Health & Human Servs.*, No. 18-0291V, 2020 WL 2954958, at *10 (Fed. Cl. Spec. Mstr. Apr. 29, 2020) (noting that it is "common for a SIRVA petitioner to delay[] treatment, thinking his/her injury will resolve on its own."); *Williams v. Sec'y of Health & Human Servs.*, No. 17-1046V, 2020 WL 3579763 (Fed. Cl. Spec. Mstr. Apr. 1, 2020); *Gurney v. Sec'y of Health & Human Servs.*, No. 17-481V, 2019 WL 2298790 (Fed. Cl. Spec. Mstr. Mar. 19, 2019); *Tenneson*

---

[5] Because the contemporaneous medical records do explicitly confirm the fact of petitioner's date confusion vis-à-vis her vaccination, this fact finding does not turn on petitioner's testimony that her psychiatric condition was the specific reason she was experiencing such date confusion.

[6] Petitioner also went to Penrose Hospital the same day. (Ex. 3.)  Those records state that petitioner had shoulder pain "for the last month."  (*Id.* at 57.)  However, the Penrose Hospital records do demonstrate some inconsistencies—for example conflicting notations regarding the effected shoulder.  (*Compare id.* at 57 (incorrectly reporting left shoulder pain), *with id.* at 60 (correctly reporting right shoulder pain).)  And, in any event, that record ultimately documents the shoulder pain as being of "unspecified chronicity.  (*Id.* at 60.)

*v. Sec'y of Health & Human Servs.* No. 16-1664V, 2018 WL 3083140 (Fed. Cl. Spec. Mstr. Mar. 30, 2018); *Forman-Franco v. Sec'y of Health & Human Servs.*, No. 15-1479V, 2018 WL 1835203 (Fed. Cl. Spec. Mstr. Feb. 21, 2018).

Accordingly, petitioner has preponderantly established that she began experiencing right shoulder pain within 48 hours of receiving her flu vaccination.

## VI. Conclusion

In light of the above, there is preponderant evidence that petitioner experienced right shoulder pain within 48 hours of her January 15, 2019 flu vaccination.

**IT IS SO ORDERED.**

<u>s/Daniel T. Horner</u>
Daniel T. Horner
Special Master