# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1917V
Filed: November 13, 2023

| | |
|---|---|
| DEBRA CAIN,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Special Master Horner |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for petitioner.
*Benjamin Patrick Warder*, U.S. Department of Justice, Washington, DC, for respondent.

## DECISION AWARDING DAMAGES[1]

On December 18, 2019, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.* ("the Vaccine Act").[2]  (ECF No. 1.)  Petitioner alleged that she suffered from a shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine that she received on January 15, 2019.  (*Id.*; ECF No. 33.)  On November 29, 2022, I issued a decision finding that petitioner was entitled to compensation for her SIRVA.  (ECF No. 48.)  For the reasons discussed below, I now find that petitioner is entitled to compensation in the amount of $97,500.00.

## I. Procedural History

This case was initially assigned to the Special Processing Unit ("SPU").  (ECF No. 8.)  Petitioner initially filed medical records, labeled Exhibits P1-P8.  (ECF No. 6.)

---

[1] Because this document contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the document will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] All references to "§ 300aa" below refer to the relevant section of the Vaccine Act at 42 U.S.C. § 300aa-10-34.

1

Petitioner filed additional medical records, labeled Exhibits P9-P16, between June of 2020 and February of 2021.  (ECF Nos. 13, 17, 21.)  Petitioner filed her statement of completion on February 10, 2021.  (ECF No. 22.)  Respondent filed his Rule 4 Report on April 19, 2021, primarily raising an issue as to onset of petitioner's alleged condition and recommending against compensation.  (ECF No. 25.)

Thereafter, the case was assigned to the undersigned.  (ECF Nos. 26-27.)  Petitioner filed additional medical records, labeled Exhibit P17, on August 11, 2021.  (ECF No. 32; Ex. P17.)  On August 18, 2021, the undersigned held a fact hearing.  (ECF No. 35.)  Subsequently, petitioner filed an amended petition on September 8, 2021, to clarify that she alleged a Table Injury of SIRVA.  (ECF No. 33.)  On November 18, 2021, petitioner filed additional documentation regarding her insurance coverage.  (ECF No. 38; Ex. P18.)

After briefing, the undersigned issued a fact finding on August 31, 2022.  (ECF No. 42.)  The undersigned found that "there is preponderant evidence that petitioner experienced right shoulder pain within 48 hours of receiving her January 15, 2019 flu vaccination."  (*Id.* at 13.)  On November 14, 2022, respondent filed an amended Rule 4 Report, in which he noted that "[i]n light of the Special Master's fact ruling, and medical record evidence submitted in this case, DICP has concluded that petitioner suffered SIRVA as defined by the Vaccine Injury Table."  (ECF No. 47, p. 8.)  Accordingly, the undersigned issued a ruling on entitlement, finding that petitioner is entitled to compensation.  (ECF No. 48, p. 2.)

The parties were subsequently unable to resolve damages informally.  On March 10, 2023, petitioner filed an additional affidavit and a motion for ruling on the record for petitioner's damages.  (ECF Nos. 54, 55; Ex. P19.)  Petitioner's motion confirms that only an award for actual pain and suffering is sought.  (ECF No. 55, p. 33.)  Respondent filed a response on April 12, 2023, and petitioner filed her reply on April 27, 2023.  (ECF Nos. 56, 57.)

Based on all of the above, I have concluded that the parties have had a full and fair opportunity to develop the record and that it is appropriate to resolve damages on the existing record.  See *Kreizenbeck v. Sec'y of Health & Human Servs.*, 945 F.3d 1362, 1366 (Fed. Cir. 2020) (citing *Simanski v. Sec'y of Health & Human Servs.*, 671 F.3d 1368, 1385 (Fed. Cir. 2012); *Jay v. Sec'y of Dept. of Health & Human Servs.*, 998 F.2d 979, 983 (Fed. Cir. 1993)); *see also* Vaccine Rule 8(d); Vaccine Rule 3(b)(2).  Accordingly, petitioner's motion is now ripe for a ruling.

## II.   Factual History

### a.  As Reflected in Medical Records

Before her vaccination, petitioner was involved in a motor vehicle accident in March of 2003.  (Ex. P14, p. 6.)  During the accident, petitioner suffered an injury to her left shoulder and on February 16, 2012, petitioner underwent a subacromial decompression on this shoulder.  (Ex. P11, p. 4; *see also* Ex. P3, p. 57.)  Petitioner also has a history of left leg numbness, chronic back pain, sciatica, gastroesophageal reflux disease, left knee pain, hypertension, hyperlipidemia, asthma, major depression, and

anxiety.  (Ex. P3, p. 17; Ex. P8, pp. 4, 9, 17; Ex. P17.)  On January 15, 2019, petitioner received the subject flu vaccine in her right shoulder at a Safeway Pharmacy.  (Ex. P1, p. 4; Ex. P16, p. 4.)  Before receiving her vaccine, she had no history of right shoulder pain.

Petitioner first sought treatment for her right shoulder pain at UC Health Memorial Hospital's emergency department on April 25, 2019, about three months post-vaccination.  (Ex. P13, p. 9.)  She described her pain as worsening with movement.  (*Id.* at 10.)  The record states that petitioner had full passive range of motion; however, she experienced pain with abduction.  (*Id.* at 12.)  Petitioner was prescribed 50 mg of tramadol to help with her pain.  (*Id.* at 10.)  Later that same night, petitioner presented to the emergency room at Penrose Hospital for hypertension and chronic pain in her right shoulder.[3]  (Ex. P3, pp. 48-49.)  Petitioner described her pain as a 10/10.  (*Id.* at 51.)  Petitioner had an x-ray of her right shoulder taken; however, it revealed no evidence of fracture or dislocation.  (*Id.* at 60.)  Petitioner was given a shot of Toradol and was told to follow up with her primary care physician for her hypertension.  (*Id.*)

About a month later, on May 31, 2019, petitioner saw Dr. Dominique Walker for an initial visit and to establish a primary care physician after moving from Arizona to Colorado.  (Ex. P4, p. 57.)  During her appointment, petitioner discussed her chronic right shoulder pain with Dr. Walker who referred her to Dr. John Pak, an orthopedic surgeon.  (*Id.* at 54, 56.)  Petitioner saw Dr. Pak on June 25, 2019.  (Ex. P5, p. 41.)  Dr. Pak diagnosed petitioner with both bursitis and adhesive capsulitis of the right shoulder.  (*Id.*)  Petitioner described how she had both increased pain and decreased range of motion following her flu shot.  (*Id.* at 43.)  Dr. Pak recommended a cortisone injection, which she received at this appointment, and physical therapy.  (*Id.* at 24, 43.)  Petitioner described her "pain as sharp, radiating, burning, tingling, numbness, and deep."  (*Id.* at 43.)  During this appointment she rated her pain an 8/10.  (*Id.*)  She described "overhead activities, reaching behind, reaching to the side, sleeping on affected side, driving, [activities of daily living] and lifting" as aggravating factors.  (*Id.*)  During an exam of her right shoulder, Dr. Pak noted that she had tenderness and an abnormal her range of motion.  (*Id.* at 46.)

Petitioner began physical therapy on July 8, 2019.  (Ex. P6, p. 6; Ex. P10, p. 13.)  On that day, petitioner reported her pain as a 5/10 at best and a 10/10 at worst.  (Ex. P6, p. 6.)  She further reported pain, stiffness, loss of motion, muscle spasms, soreness, and weakness.  (*Id.*)  The physical therapist outlined a treatment plan including Dry Needling, e-Stim, home exercises, hot and cold packs, joint and soft tissue mobilization, manual therapy, neuromuscular re-education, and therapeutic activities and exercises.  (*Id.* at 8.)  The physical therapist recommended that petitioner be seen two times a week for six weeks.  (*Id.*)  Petitioner's next physical therapy session was on July 11, 2019.  (Ex. P6, p. 3; Ex. P10, p. 10.)  During this session, she again described her pain as a 5/10 at best and a 10/10 at worst.  (Ex. P6, p. 3.)  The physical therapist described petitioner as "able to perform the exercises currently with difficulty due to pain."  (*Id.* at 4.)

---

[3] This record inconsistently records the affected shoulder.  (*Compare* Ex. P3, p. 57 (incorrectly recording the left shoulder), *with id.* at 60 (correctly recording the right shoulder).)

On July 19, 2019, petitioner saw Dr. Walker for conditions unrelated to her shoulder pain. (Ex. P4, p. 12.) At this appointment, Dr. Walker briefly mentioned petitioner's shoulder pain during a physical examination. (*Id.* at 18.) She described petitioner as exhibiting "decreased range of motion, tenderness, crepitus, pain and decreased strength." (*Id.*)

On July 23, 2019, petitioner returned to Dr. Pak for a follow up appointment. (Ex. P5, p. 24.) Petitioner described no improvement in her symptoms and rated her pain as a 10/10. (*Id.* at 26.) During this appointment, petitioner elected to proceed with a "more aggressive" treatment plan and opted for surgery. (*Id.*) Petitioner had her pre-operative appointment with Dr. Pak on August 9, 2019, and on August 14, 2019, she had a right shoulder arthroscopy with capsular release and subacromial decompression and acromioplasty. (*Id.* at 7; Ex. P7, p. 2; Ex. P12, p. 4.) Dr. Pak noted that petitioner had a "fairly tight capsule throughout along with what appears to be a market synovitis throughout the shoulder joint. No rotator cuff [tear] was noted intra-articular or extra-articular in the subacromial space." (Ex. P12, p. 4.)

Less than 48 hours after her procedure, petitioner was taken by ambulance to Penrose Hospital Emergency Department due to nausea, vomiting, and abdominal pain. (Ex. P3, pp. 5, 16.) An x-ray was done on petitioner's stomach, but it did not reveal any evidence of obstruction or free air. (*Id.* at 21.) She also had no signs of an infection. (*Id.*) Petitioner was given "symptomatic medications" and "oral fluids" before being sent home. (*Id.*)

On August 21, 2019, petitioner had a physical therapy session. (Ex. P10, p. 7.) She reported her pain as a 4/10 at its best and a 7/10 at its worst. (*Id.*) She further reported some loss of motion, pain, and stiffness. (*Id.*) The physical therapist noted that petitioner had shown signs of progress. (*Id.* at 8.) The physical therapist again recommended that petitioner be seen two times a week for six weeks. (*Id.* at 9.)

Petitioner's next physical therapy session was on August 23, 2019. (*Id.* at 5.) She again reported her pain to be a 4/10 at its best and a 7/10 at its worst. (*Id.*) The physical therapist reported some improvement and recommended continuing the prescribed number of sessions. (*Id.* at 6.) Petitioner was seen for another physical therapy session on September 19, 2019. (*Id.* at 2.) The physical therapist noted that petitioner was "motivated and is able to perform exercises correctly with difficulty due to pain." (*Id.* at 3.) However, it was noted that petitioner "self-discharged" at this appointment. (*Id.*)

Petitioner had two additional follow up appointments with Dr. Pak. (Ex. P9, pp. 3, 7.) The first one was on October 7, 2019. (*Id.* at 7.) During this appointment, Dr. Pak noted that petitioner "continues to have improvement of range of motion although she still has some pain." (*Id.*) Petitioner reported she had been doing physical therapy exercises at home and felt her strength was "improving." (*Id.* at 8.) Dr. Pak recommended a cortisone injection, which she received at this appointment, and formal physical therapy. (*Id.* at 7, 9.) Petitioner's last appointment with Dr. Pak was on November 15, 2019. (*Id.* at 3.) She reported she was doing much better after the injection, and Dr. Pak recommended that petitioner continue her physical therapy sessions at home. (*Id.*)

### b. As Reflected in Affidavits

#### i. Petitioner

Petitioner has submitted two affidavits in this case. (Ex. P2; Ex. P19.) In her first affidavit, petitioner notes that she received a flu vaccine in her right arm on January 15, 2019. (Ex. P2, ¶¶ 1, 9.) Petitioner describes how she had "no orthopedic issues related to her right shoulder" before receiving the flu vaccine. (*Id.* ¶ 3.) Petitioner explains that "within hours of getting the flu shot, [her] right shoulder started to swell up like an egg at the injection site." (*Id.* ¶ 10.) Petitioner describes how the pain was worse than flu shots that she had gotten in the past. (*Id.*) She notes that, over the next few days, despite the swelling going down, her pain increased while her range of motion decreased. (*Id.*) After the swelling decreased, she noticed the shot had been administered too high in her shoulder. (*Id.* ¶ 11.)

Petitioner describes how her pain continued for months and progressively worsened. (*Id.* ¶ 12.) She explains that she was "in the process of establishing a new primary care physician." (*Id.*) She also explains that, because she had Medicaid, it was unlikely she would be able to see a specialist. (*Id.*) Therefore, petitioner claims that she waited and hoped her pain would subside. (*Id.*)

Petitioner states that she went to the emergency room at Penrose Hospital on April 25, 2019, due to her shoulder pain. (*Id.* ¶ 13.) She explains that she was given a shot of Toradol and a sling. (*Id.*) Petitioner subsequently established a new primary care physician, Dr. Walker, on May 31, 2019. (*Id.* ¶ 14.) During her first appointment, petitioner explained her shoulder pain to Dr. Walker. (*Id.*) On June 25, 2019, petitioner saw an orthopedist and received a cortisone injection; however, her pain returned and her range of motion remained "severely limited." (*Id.* ¶ 15.) She stated that she returned to the orthopedist, who recommended surgery. (*Id.*) Petitioner had surgery on August 14, 2019, and started physical therapy thereafter. (*Id.* ¶ 16.) Petitioner states that she still lacks full mobility and range of motion. (*Id.* ¶¶ 7, 17.) She reports that she still feels pain in her joint and when she reaches over her head or behind her back. (*Id.*) Petitioner continues to perform physical therapy exercises at home. (*Id.*) She remains concerned that she will always have these symptoms. (*Id.*)

Petitioner further describes the emotional impact that her injury has had on her life. (*Id.* ¶¶ 17-20.) She explains how her pain, discomfort, and limited range of motion affect her daily life and has limited her ability to groom herself, change, cook, clean, and keep up around the house. (*Id.* ¶ 18.) She describes how she can no longer "do hobbies [she] once loved such as doing crochet and caring for [her] service dog." (*Id.* ¶ 19.) She worries that she will never regain full function or be pain free. (*Id.* ¶ 20.)

In petitioner's second affidavit, she reiterates the residual effects of her injury and surgery. (Ex. P19, ¶¶ 4-5.) She describes how she still does not have full mobility or range of motion and experiences continued pain. (*Id.*) She reiterates that she continues to perform physical therapy exercises at home. (*Id.*) She also reiterates that her injury has limited her ability to groom herself, change, cook, clean, upkeep the house, and participate in hobbies she once loved. (*Id.* ¶¶ 6-7.) In addition, she states

that she has trouble picking up her great granddaughter.  (*Id.* ¶ 9.)  Petitioner describes her pain as a 4 out of 10 at best and a 7 out of 10 if she has done something to aggravate her injury.  (*Id.* ¶ 10.)  She also quickly notes that she attempted to see her orthopedic surgeon on January 23, 2023; however, this appointment was cancelled due to a snowstorm and has not been rescheduled.  (*Id.* ¶ 11.)

### ii. Debora Hodge

Debora Hodge, petitioner's roommate, also submitted an affidavit in this case.[4]  (Ex. P15.)  In her affidavit, Ms. Hodge states that she could recall when petitioner received her flu vaccination because she remembers petitioner complaining of shoulder pain on the same day.  (*Id.* ¶¶ 5-6.)  She explains that petitioner "came home and immediately complained . . . of shoulder pain at the site of the injection."  (*Id.* ¶ 6.)  She also notes that the area "around the site of the injection was already swollen to the size of a golf ball."  (*Id.*)

Ms. Hodge explains that she "once worked as a medical assistant" and is familiar with the "dangers of improperly administering a vaccine."  (*Id.* ¶ 7.)  She states that she was with petitioner when petitioner went to the emergency room and indicates that the "doctor noted the swelling and the location of the injury and specifically asked if [petitioner] had received a flu shot at the location of her injury."  (*Id.* ¶ 8.)

Ms. Hodge explains,

> [Petitioner] is still learning to manage and cope with the pain in her right shoulder due to the flu shot she received.  She tried to go to physical therapy to manage and alleviate her pain, but the physical therapy made her injury hurt worse.  Though [petitioner] is still learning how to live with her shoulder injury, she still suffers from ongoing pain and discomfort.

(*Id.* ¶ 11.)

### c. As Reflected in Testimony

During a fact-finding hearing held on Wednesday, August 18, 2021, petitioner testified about her experience.  Petitioner testified that before receiving her vaccine in January 2019, she was involved in an automobile accident in 2003, during which she hurt her left shoulder. (Tr. 8.)  She had surgery on this shoulder in March of 2011 to repair lasting effects from this injury.  (*Id.* at 8-9.)  After surgery, petitioner saw a physical therapist.  (*Id.*)  Petitioner's left shoulder problems were completely resolved by about six months after her surgery.  (*Id.* at 9.)  In addition, she explained that she suffers from PTSD, depression, and agoraphobia, and that she takes Zoloft and Clonazepam.  (*Id.* at 6-7.)

Petitioner testified that she had no additional problems with either of her shoulders until she received her flu shot on January 15, 2019, at the Safeway Pharmacy while she was grocery shopping.  (*Id.* at 9-11.)  Petitioner testified that she requested

---

[4] Ms. Hodge passed away prior to the fact hearing held in this case.  (ECF No. 31.)

the vaccine in her right arm because she wanted to ensure the vaccine would not irritate her left arm. (*Id.* at 11-12.) Petitioner testified that she received the flu vaccine high in her shoulder. (*Id.* at 11.) She described how she immediately experienced pain and her arm began to swell. (*Id.* at 12.) She testified that, on that day, her overall shoulder pain was between a 4 and a 5 out of 10. (*Id.* at 12-13.) She said that she began to lose range of motion three to four days after she received her vaccine. (*Id.* at 15.)

Petitioner testified that when she got home that day she discussed her shoulder pain with her roommate, Deborah Hodge, who had been a medical assistant. (*Id.* at 13.) Petitioner explained that she and her roommate agreed that she should wait to seek medical assistance until the pain became unbearable because she did not have medical insurance at the time; she was hoping the pain would eventually subside. (*Id.*) She testified that she tried applying a hot and cold pack, using a TENS machine, and taking Tylenol in an attempt to relieve the pain. (*Id.* at 14.)

Petitioner described how, over the next few weeks, she began to lose range of motion in her shoulder and her pain increased until she could barely use her arm. (*Id.*) She stated that she considered seeing a doctor, but she did not have health insurance because she "had just moved back from Arizona to Colorado, and [her] insurance had not transferred." (*Id.* at 15.) Petitioner stated that, by April of 2019, she could not take the pain anymore. (*Id.* at 16.) By that point, she was in "severe and excruciating pain every day" and her pain was no longer subsiding with Tylenol. (*Id.*)

On April 25, 2019, petitioner had her roommate take her to the emergency room at Penrose Hospital. (*Id.* at 16-17.) She stated that the doctors "did x-rays and they gave [her] a shot of Toradol." (*Id.*) She testified that the Toradol helped, but her relief did not last very long. (*Id.* at 18.) She testified that the physician in the emergency room advised her "to see an orthopedist because [she] didn't have full range motion in that shoulder." (*Id.*)

Petitioner testified that she told the emergency room physician about the progression of her symptoms since her flu vaccination. (*Id.*) Petitioner acknowledged that she had initially told emergency room personnel that she received the flu vaccine in March 2019, instead of January 2019. (*Id.* at 18-19.) She explained:

> I had run out of my medication for my psychiatric issues. And when that happens, there's something down in my brain and I become confused, I have rapid speech, I don't know what time of day it is or what day it is sometimes. I just kind of live from hour to hour like that. I have extreme paranoia from it. . . . [U]ntil I was able to see my doctor, I was unmedicated and just kind of spinning there waiting. And no time—you know, you don't have any concept of time.
>
> . . . You get days mixed up, months mixed up, even years sometimes. But I did the best I could without being medicated . . . .

(*Id.* at 19.)

Petitioner testified that she saw her primary care physician, Dr. Walker, on May 31, 2019.  (*Id.* at 20.)  She described how she told Dr. Walker "that [she] had had the flu shot, and you know, the shoulder started blowing up on me."  (*Id.* at 21.)  Dr. Walker referred petitioner to Dr. Pak, an orthopedist.  (*Id.* at 20, 22.)

Petitioner testified that she made an appointment to see Dr. Pak for the following month.  (*Id.* at 22.)  At that appointment, Dr. Pak diagnosed petitioner with frozen shoulder, which he recommended treating first with cortisone, and if that didn't work, then he recommended surgery.  (*Id.* at 23.)  Petitioner testified that, prior to her surgery, she went to two or three physical therapy appointments, explaining: "We tried that.  It didn't work."  (*Id.* at 25.)  Petitioner stated that the cortisone injection did not relieve her pain "whatsoever."  (*Id.* at 27.)  She further explained that her pain eventually got so bad that she elected to have surgery in August of 2019.  (*Id.*)

Petitioner testified that her surgery went well, except she had to return to the emergency room within 48 hours due to an adverse reaction to the pain pump she was given.  (*Id.* at 28.)  She reported that she attended a few physical therapy sessions after her surgery.  (*Id.*)  However, she explained that she "was suffering from the agoraphobia and going out of the house all these times to doctor's appointments was not helping it."  (*Id.*)  She stated that she continued to do her physical therapist at home with the help of her roommate who "was a physical therapist with Dr. Mark Holmstrom up in Denver for years."  (*Id.* at 29.)  She testified that she also received a second cortisone injection after her surgery.  (*Id.* at 30.)

During the hearing, petitioner testified to her current condition.  (*Id.* at 30.)  She described how she still experiences weakness and a limited range of motion.  (*Id.* at 28, 30.)  She cannot perform tasks, such as braiding her hair, and has trouble picking up her great granddaughter.  (*Id.* at 30.)

### III. Party Contentions

#### a. Petitioner's Motion

Petitioner requests $125,000.00 for actual pain and suffering.  (ECF No. 55, p. 1.)  In support of this request, petitioner encourages the Court to consider both petitioner's medical records and her testimony as the medical records only show a snapshot in time and her testimonial evidence can be used to supplement this record.  (*Id.* at 14-21 (citing *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993); *Murphy v. Sec'y of Health & Human Servs.,* 23 Cl. Ct. 726, 733 (1991), *aff'd*, 968 F.2d 1226 (Fed. Cir. 1992); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069, at *3 (Fed. Cl. Spec. Mstr. July 29, 2019)).)  Petitioner argues that the "totality of the evidence in the record" supports her "position that she be entitled to $125,000.00 for her pain and suffering relating to her SIRVA surgery claim."  (*Id.* at 27.)

Petitioner also argues that her requested award is reasonable in light of the facts of this case and consistent with prior SIRVA awards.  (*Id.*)  Specifically, petitioner cites the following reasoned decisions as reflecting comparable facts: *Collado v. Secretary of Health & Human Services,* No. 17-0225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June

8

6, 2018) (awarding $120,000.00 for actual pain and suffering); *Dobbins v. Secretary of Health & Human Services,* No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for actual pain and suffering); *Wilt v. Secretary of Health & Human Services,* No. 18-0446V, 2020 WL 1490757 (Fed. Cl. Spec. Mstr. Feb. 24, 2020) (awarding $110,000.00 for actual pain and suffering); *Vaccaro v. Secretary of Health & Human Services,* No. 19-1883V, 2022 WL 662550 (Fed. Cl. Spec. Mstr. Feb. 2, 2022) (awarding $110,000.00 for actual pain and suffering); *Rafferty v. Secretary of Health & Human Services,* No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) (awarding $127,500.00 for actual pain and suffering). (*Id.* at 23-27.) Petitioner notes that the petitioners in the cited cases underwent surgery and experienced complete recovery after treatment. (*Id.*) She contends that her pain has continued after surgery, warranting a higher award in this case. (*Id.* at 33.)

### b. Respondent's Response

Respondent proposes an award of $61,500.00 for petitioner's actual pain and suffering. (ECF No. 56, p. 1.) Respondent specifically points out that "petitioner did not seek medical treatment for her right-sided SIRVA until April 25, 2019, more than three months after her receipt of the flu vaccination on January 15, 2019." (*Id.* at 10 (citing Ex. 13, p. 10).) Respondent notes that a delay in seeking treatment is a factor that should be considered when evaluating "severity of petitioner's SIRVA from a damages perspective" and "the fact that petitioner underwent surgery on her right shoulder does not, standing alone, warrant a pain and suffering award on the higher end of the statutory range." (*Id.* at 11.)

Respondent describes petitioner's treatment as "limited in duration," noting that her treatment consisted of standard modalities for SIRVA, lasted approximately six and a half months, and resulted in an improvement of her injury. (*Id.*) Respondent explains that petitioner's treatment included two emergency department visits; a primary care visit; four physical therapy sessions, two before surgery and two after surgery; and two steroid injections, one before surgery and one after surgery. (*Id.* at 11-12 (citing Ex. 3, pp. 47-89; Ex 4, pp. 52-72; Ex 5, pp. 26, 43, 41-61; Ex. 6, pp. 3-13; Ex. 9, pp. 3-5, 7-10; Ex. 10, pp. 5-9; Ex. 12, p. 4; Ex 13, pp. 6-32).)

Respondent contends that the prior SIRVA awards cited by petitioner are distinguishable. (*Id.* at 13-19.) Specifically, respondent explains that, "unlike the petitioners in *Collado*, *Dobbins*, *Wilt*, and *Rafferty*, the instant petitioner did not undergo an MRI." (*Id.* at 16.) Additionally, "petitioner participated in fewer physical therapy sessions than the petitioners in *Collado*, *Dobbins*, *Wilt*, *Vaccaro*, and *Rafferty*." (*Id.*) Specifically, respondent notes "the instant petitioner only participated in four physical therapy sessions, two pre-surgery and two post-surgery, while the petitioner's in *Dobbins*, *Wilt*, *Vaccaro*, and *Rafferty* participated in multiple months of physical therapy, ranging in total from twenty to fifty sessions." (*Id.*) Respondent further argues that "petitioners in *Collado*, *Dobbins*, *Wilt*, and *Rafferty* initially sought treatment for their shoulder injuries within days to weeks" of their vaccinations. (*Id.*) Although respondent acknowledges that the *Vaccaro* petitioner had a similar delay in seeking treatment to the petitioner in this case, respondent distinguishes this case by noting that "the petitioner in *Vaccaro* had more extensive recovery period following surgery, involving participation in twenty-six more physical therapy sessions than the instant petitioner." (*Id.*) Finally,

respondent contends that there were "extenuating circumstances" in *Dobbins* and *Rafferty* that justified "a higher award than other comparable cases." (*Id.*) Respondent describes how the *Dobbins* petitioner had increased distress and pain due to caring for her terminally ill mother and the *Rafferty* petitioner was the primary caregiver of two young sons. (*Id.* at 16-17.) Respondent acknowledges petitioner's claim that her injury has made it difficult for her to pick up her great-granddaughter; however, respondent notes that "it does not appear that petitioner is the primary caregiver of her great-granddaughter, and it does not appear that petitioner faced similar difficulties during her course of treatment as the petitioners in *Dobbins* and *Rafferty* did." (*Id.* at 17.)

Respondent cites two cases that he argues are "more instructive" to the facts of this case. (*Id.*) Specifically, respondent cites *Shelton v. Secretary of Health & Human Services,* No. 19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021) (awarding petitioner $97,500.00 for actual pain and suffering), and *Hunt v. Secretary of Health & Human Services,* No 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding petitioner $95,000.00 for actual pain and suffering). Respondent contends that, similar to the petitioner in this case, the petitioners in *Shelton* and *Hunt* also had "significant gaps" in their treatment. (*Id.* at 18.) However, respondent argues that the petitioner in this case is entitled to less than the amounts awarded to the petitioners in *Shelton* and *Hunt* because those "petitioners' courses of treatment were more extensive than that of the instant petitioner." (*Id.* at 19.)

### c. Petitioner's Reply

Petitioner raises two challenges to respondent's position: (1) "the three month delay between vaccination and [p]etitioner's reporting her injury to a medical provider is rationally explained and does not present evidence of a mild injury", and (2) "[r]espondent's proffered cases are not comparable to [p]etitioner's case." (ECF No. 57, pp. 3-6.)

First, petitioner explains that respondent ignored the rationale for petitioner's delay in treatment. (*Id.* at 3.) During the fact hearing, petitioner testified that her delay in treatment was a result of her lack of medical insurance during her move from Arizona to Colorado. (*Id.*) Petitioner contends that "a three-month gap between onset and medical visit is not a delay and even if it was considered to be one, there is a valid and logical explanation based on lack of health insurance for a destitute petitioner who could not afford out of pocket medical expenses to visit the doctor sooner." (*Id.*) Petitioner argues that this delay should have no impact on her pain and suffering award. (*Id.*)

Second, petitioner contends that the prior SIRVA awards cited by respondent are distinguishable and reiterates her explanation of the cases cited in her original brief. (*Id.* at 4-10.) She further cites two cases decided by the undersigned: *Heiner v. Secretary of Health & Human Services*, No. 19-1339V, 2022 WL 4457901 (Fed. Cl. Spec. Mstr. Aug. 29, 2022) (awarding $60,000.00 for actual pain and suffering), and *Lang v. Secretary of Health & Human Services*, No. 17-995V, 2022 WL 4295445 (Fed. Cl. Spec. Mstr. Aug. 24, 2022) (awarding $195,000.00 for actual pain and suffering). (*Id.* at 10-12.) Petitioner argues that the petitioner in this case received more aggressive treatment than the petitioner in *Heiner*, but less than the petitioner in *Lang*. (*Id.* at 13.)

10

## IV. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include compensation "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 300aa-15(a)(4). Additionally, a petitioner may recover any unreimbursable expenses related to her injury. § 300aa-15(a)(1)(B). Finally, petitioners who have had their earning capacity adversely impacted due to their vaccine injury may receive "compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections." § 300aa-15(a)(3)(A). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). In this case, petitioner only requests compensation for actual pain and suffering. (*See* ECF Nos. 55, 57.)

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (explaining that "[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). In general, factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may also consider prior awards when determining what constitutes an appropriate award of damages. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"); *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (explaining that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, decisions regarding prior awards, although potentially persuasive, are not binding. *See Nance v. Sec'y of Health & Human* Servs., No. 06-0730V, 2010 WL 3291896, at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *see also Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."), *aff'd*, 191 F.3d 1344 (Fed. Cir. 1999).

Notably, the majority of SIRVA cases resolve within the SPU, which is overseen by the Chief Special Master. In a recent decision awarding damages, the Chief Special Master explained that, as of July 1, 2023, 3,211 SIRVA cases had been compensated within the SPU since its inception in July 2014. *See Mussehl v. Sec'y of Health &*

11

*Human Servs.,* No. 21-0031V, 2023 WL 5203102, at *2 (Fed. Cl. Spec. Mstr. July 12, 2023). Among those cases, only 173 were awarded compensation based on a reasoned decision of the special master. *Id.* Among the 173 decisions, the awards for actual pain and suffering ranged from $40,757.00 to $265,034.87, with a median award of $92,299.83. *Id.* at *3. Additionally, I have issued three prior reasoned decision awarding damages in a SIRVA cases. *See Lang v. Sec'y of Health & Human Servs.*, No. 17-995V, 2022 WL 3681275 (Fed. Cl. Spec. Mstr. July 25, 2022); *Heiner v. Sec'y of Health & Human Servs.*, No. 19-1339V, 2022 WL 4457901 (Fed. Cl. Spec. Mstr. Aug. 29, 2022); *Ratzlaff v. Sec'y of Health & Human Servs.*, No. 18-1017V, 2023 WL 4072909 (Fed. Cl. Spec. Mstr. May 24, 2023).

Unsurprisingly, stipulated and proffered awards cover a much larger range—from $5,000.00 for the lowest stipulated amount to $1,845,047.00 for the highest proffered award. *Mussehl*, 2023 WL 5203102, at *3. Of course, these amounts are not limited to pain and suffering awards. Moreover, as the Chief Special Master observed, "even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision." *Id.* at *2 n.8.

## V.     Analysis

I have reviewed previous SIRVA awards, the arguments presented by the parties, and the totality of the evidentiary record. As noted above, the primary considerations informing pain and suffering in SIRVA cases is the severity and duration of the shoulder pain. Numerous aspects of a petitioner's medical history potentially speak to these issues, including the total duration of the petitioner's pain, the total duration of petitioner's reduced range of motion, the length of time over which the petitioner actively treated the condition, the duration and outcome of physical therapy, the modalities of treatment (*e.g.* steroid injections, surgeries, etc.), the severity of the MRI or surgical findings, subjective reports of pain levels, and the ultimate prognosis.

Petitioner's medical records suggest that her treatment history, while shorter than has been seen in many other cases, was serious enough to warrant surgery. Petitioner ultimately waited three months before seeing a physician about her shoulder pain. (Ex. P16, p. 4; Ex. P13, p. 9.) However, when petitioner did seek care, her symptoms were serious enough that she went to two emergency rooms in one day, seeking relief for her pain. (*Id.*; Ex. P3, p. 48-49.) She had limited range of motion and described her pain as a 10/10. (Ex, P3, p. 51.) Over the course of her treatment, she received two therapeutic injections, attended four physical therapy sessions and four appointments with her orthopedic surgeon, and underwent surgery, during which her orthopedic surgeon noted a "fairly tight capsule throughout along with what appears to be a marked synovitis throughout the shoulder joint" and "[n]o rotator cuff [tear] was noted intra-articular or extra-articular in the subacromial space."[5] (*Id.*; Ex. P5, pp. 24, 41, 43; Ex. P6, pp. 3, 6; Ex. P7, p. 2, 35; Ex. P9, pp. 3, 7, 9; Ex. P10, pp. 2, 7; Ex. P14, p. 4.)

---

[5] Respondent noted the lack of any MRI in this case; however, this is less significant given the availability of surgical findings.

Petitioner underwent capsular release, subacromial decompression, and acromioplasty. (Ex. P12, p. 4.)  The final two records that mention petitioner's shoulder injury are from encounters with Dr. Pak.  The first one was on October 7, 2019.  (Ex. P9, p. 7.)  At that time, petitioner still described some pain, and she received the second cortisone injection to treat her symptoms.  (*Id.*)  This evidence supports a finding that petitioner's pain persisted for at least some time after surgery.  However, by the time of her second appointment with Dr. Pak on November 15, 2019, it was noted that petitioner's "[p]ain is well managed" and her "[p]rognosis is good."  (*Id.* at 3.)  Although petitioner asserts ongoing sequela, this effectively marks the conclusion of her medical treatment for her condition.  Therefore, based on the record in this case, I find that petitioner's total duration of pain and suffering throughout her treatment history from vaccination to near, albeit not complete, recovery is about 10 months.

As respondent stresses, petitioner waited approximately three months before seeking treatment.  (Ex. P16, p. 4; Ex. P13, p. 9.)  Petitioner testified that she was trying to wait for her medical insurance to transfer from Arizona to Colorado before she went to see a physician.  (Tr. 15.)  In spite of petitioner's delay in seeking treatment, I found that her onset did occur within 48 hours of receiving her flu vaccine.  (ECF No. 42, p. 1.)  However, I also indicated that petitioner's lack of insurance coverage did not completely explain why she did not seek treatment until April 25, 2019.  (*Id.* at 12.)  I also explained that several of her treatment records documented reports that petitioner's symptoms worsened in March of 2019.  (*Id.*)  Prior cases have noted that a delay in seeking treatment, even while not necessarily informative regarding onset and entitlement, may nonetheless still be relevant to assessing the severity of pain and suffering.  *See Eshraghi v. Sec'y of Health & Human Servs.*, No. 19-0039V, 2021 WL 2809590, at *3 (Fed. Cl. Spec. Mstr. June 4, 2021); *Marino v. Sec'y of Health & Human Servs.*, No. 16-0622V, 2018 WL 2224736, at *8 (Fed. Cl. Spec. Mstr. Mar. 26, 2018).  The insurance issue notwithstanding, petitioner's delay in seeking treatment does suggest that petitioner's pain was less severe during the three months she delayed treatment.  Petitioner herself explained that her pain increased over time and that she ultimately sought treatment when she felt unable to cope with the pain.  (Ex. P2, ¶ 12; Tr. 13.)  Therefore, petitioner's delay in seeking medical treatment will be partly informative of the award in this case, though this factor carries less overall significance than respondent seems to urge.

I have also reviewed the cases submitted by the parties in this case.  Petitioner and respondent referenced a total of nine cases (petitioner cites seven and respondent two).  Petitioner urges direct comparison to several cases with awards ranging from $110,000.00 to $127,500.00, and respondent cites two cases awarding $95,000.00 and $97,500.00, though arguing for a substantially lower award. (ECF Nos. 55-57.)  Given that pain and suffering is inherently subjective and given the number of variables involved in assessing each petitioner's medical history, direct comparison to other cases is difficult.  While I reviewed all the cases presented by both petitioner and respondent, I found three to be the most comparable to this case, one cited by petitioner and the two cited by respondent.  These three cases reflect a narrower range of awards between $95,000.00 to $110,000.00.

In the first case, *Vaccaro*, the petitioner waited about three months before seeking medical treatment. 2022 WL 662550, at *3. The petitioner saw an orthopedist who diagnosed her with adhesive capsulitis. *Id.* He gave her a subacromial steroid injection and recommended that she do at-home exercises and treat with ice and anti-inflammatory drugs as needed. *Id.* The petitioner visited her orthopedist two more times and reported pain ranging from 6 out of 10 to 8 out of10. *Id.* Eventually, the petitioner underwent arthroscopic surgery, during which the petitioner's orthopedist discovered extensive adhesions and scar tissue that confirmed the diagnosis of adhesive capsulitis, tendonitis, and a torn labrum. *Id.* After her surgery, the petitioner underwent physical therapy for three months before she was finally discharged. *Id.* at *3-4. During that time, she saw her orthopedist five additional times. *Id.* at *4. At her last appointment, the petitioner reported that she had made a full recovery and experienced little to no pain. *Id.* Although the *Vaccaro* petitioner filed affidavits "suggesting she still suffers residual pain," the Chief Special Master noted that no medical records suggesting additional treatment had been filed. *Id.* Therefore, based on the records, the Chief Special Master determined that there was "objective, medical record evidence to support a finding that Petitioner's symptoms continued for nearly eight months." *Id.* at *5. He noted that, "[a]lthough she did not seek care until three months after vaccination, once she did so her treatment efforts continued for over four and a half months, including surgery, an unsuccessful cortisone injection, and three months of intensive PT." *Id.* The Chief Special Master relied on this to conclude that, while petitioner's "delay in treatment does suggest a lack of immediate severity (and is a relevant consideration herein)," the treatment "course thereafter underscores that the injury was serious enough to warrant persistent medical attention." *Id.* The Chief Special Master also determined that the *Vaccaro* petitioner had not sought medical attention for her injury in nearly three years and that her final records suggested she regained full function and experienced good recovery from her injury. *Id.* The *Vaccaro* petitioner was ultimately awarded $110,000.00 in actual pain and suffering. *Id.* at *6.

In the second case, *Shelton*, the petitioner delayed seeking treatment for five months following her vaccination. 2021 WL 2550093, at *5. The petitioner's treatment included an initial three-month course of physical therapy, three steroid injections, an MRI, and eventually extensive right shoulder surgery and post-operative physical therapy. *Id.* at *7-8. Her "post-operative diagnoses included: 1) low-grade partial articular sided supraspinatus tear, 2) synovitis in the rotator interval with adhesions, 3) impingement syndrome with anterolateral bone spur, 4) AC arthrosis, and 5) bicipital tendinopathy." *Id.* at *8. The *Shelton* petitioner experienced pain levels that fluctuated from 2 out of 10 to 8 out of 10. *Id.* at *7. The Chief Special Master offered a comparison to two prior cases when determining his ultimate award. *Id.* at *7-8. In particular, he explained that *Dirksen v. Secretary of Health & Human Services,* No. 16-1461V, 2018 WL 6293201 (Fed. Cl. Spec. Mstr. Oct. 18, 2018), was comparable but that the *Shelton* petitioner's multiple steroid injections and surgical procedure required a higher award. *Id.* As such, while the *Dirksen* petitioner was awarded $85,000.00 for actual pain and suffering, the Chief Special Master awarded the *Shelton* petitioner $97,500.00. *Id.*

In the final case, *Hunt*, the Chief Special Master determined that the petitioner "suffered a mild-to-moderate SIRVA for approximately fifteen months, with periods of little-to-no pain." 2022 WL 2826662, at *8. The petitioner's treatment included four cortisone injections, two before surgery and two after surgery, that relieved her pain for quite some time; physical therapy for approximately two months before surgery and two months after surgery; an MRI; and eventually surgery, which involved limited debridement, subacromial decompression, partial acromioplasty, and coracoacromial release of the left side. *Id.* at *2-4, 9. Throughout her course of treatment, the *Hunt* petitioner reported pain ranging between 1 out of 10 and 5 out of 10. *Id.* The Chief Special Master ultimately determined the course of treatment in *Hunt* was most similar to *Shelton* where, as explained above, the petitioner received several cortisone injections and underwent numerous physical therapy sessions, an MRI, and surgery. *Id.* The Chief Special Master awarded the *Hunt* petitioner $95,000.00 for pain and suffering. *Id.* at *10.

Respondent has not provided a satisfying explanation for why petitioner's award should be $30,000.00 less than the cases he himself cites as comparable. *Hunt* and *Shelton*, which awarded $95,000.00 and $97,500.00, respectively, appear to be the lowest reasoned SIRVA awards to date for cases involving surgery. In this case, respondent is suggesting a lower award than even *Dirksen*, which was a non-surgical case that the Chief Special Master specifically distinguished in *Shelton* due to the fact that the petitioner in *Shelton* underwent surgery and received multiple steroid injections, just like this petitioner. *Shelton,* 2021 WL 2550093, at *8. Petitioner's delay in treatment, her less intensive treatment pre-surgery, overall duration of her treatment history, and improvement in her symptoms post-surgery, all deserve consideration when determining the amount of petitioner's award. However, even accounting for those factors, it is still not clear how respondent arrives at an amount that is less than two-thirds of the amount awarded to similarly situated petitioners.

Respondent argues that this petitioner's treatment history includes less intensive physical therapy and fewer cortisone injections than that of the petitioners in *Hunt* and *Shelton*. (ECF No. 56, p. 19.) However, it is also relevant that, once petitioner's injury came to medical attention, she reported greater pain than the pain described by the petitioners in *Shelton* and *Hunt*. At its worst, petitioner described her pain as a 10 out of 10, and at its best, she described her pain as a 4 out of 10. (Ex. P5, p. 26; Ex. P10, p. 7.) In fact, petitioner's medical records reflect that the relative shortness of petitioner's treatment history was due in part to her opting for surgery as a "more aggressive" option due to her pain. (Ex. P5, p. 26.) Unlike in *Hunt*, where the petitioner had a longer overall period of treatment but also had periods of little to no pain, once petitioner sought care, as in *Vacarro*, she sought care consistently and complained of symptoms persistently. In her most recent medical record, petitioner did not express complete relief from pain, nor did she regain complete range of motion. (Ex. P9, p. 7.) However, the lack of medical treatment since 2019 does suggest that petitioner experienced a substantial recovery. *See Vaccaro,* 2022 WL 662550, at *5. Although there are obviously some differences, I do not see how this petitioner's history is substantially different from the presentations in *Shelton* and *Hunt*.

15

Respondent also points to petitioner's delay in treatment as a reason to decrease petitioner's damages award. (ECF No. 56, p. 16.) As noted above, the treatment delay in the current case is relevant to the award analysis; however, it does not counsel a deviation from the above-discussed cases. In both *Shelton* and *Vaccaro*, the petitioners delayed their treatment five months and three months, respectively. *Shelton,* 2021 WL 2550093, at *7; *Vaccaro,* 2022 WL 662550, at *3. The Court considered petitioners' delay in treatment when determining their ultimate awards. *Shelton,* 2021 WL 2550093, at *7; *Vaccaro,* 2022 WL 662550, at *3.

In light of all of the above, I conclude that $97,500.00 represents a reasonable award for petitioner's pain and suffering.

## VI.    Conclusion

After weighing the evidence of record within the context of this Program, I find that $97,500.00 represents a reasonable and appropriate award for petitioner's actual pain and suffering. **I thus award petitioner a lump sum payment of $97,500.00, representing compensation for actual pain and suffering in the form of a check payable to petitioner.** This amount represents compensation for all damages available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this decision. [6]

**IT IS SO ORDERED.**

                                               **s/Daniel T. Horner**
                                               Daniel T. Horner
                                               Special Master

---

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.